## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **PEGGY L. COFFEY,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:15cv00012 |
| | ) | **MEMORANDUM  OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Peggy L. Coffey, ("Coffey"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), widow's insurance benefits based on disability, ("DWIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 402(e), 423 and 1381 *et seq.* (West 2011, West 2012 & Supp. 2016). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument, therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may

1

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Coffey protectively filed her applications for DIB, DWIB and SSI on September 1, 2010, alleging disability as of May 31, 2010, due to depression and a lower lumbar injury. (Record, ("R."), at 359-64, 371-72, 401, 442, 464.) The claims were denied initially and upon reconsideration. (R. at 204-06, 209-11, 215-17, 220-22, 226-28, 232, 233-41.) Coffey then requested a hearing before an administrative law judge, ("ALJ"). (R. at 242.) A hearing was held on December 6, 2011, at which Coffey was represented by counsel. (R. at 47-72.)

By decision dated January 23, 2012, the ALJ denied Coffey's claims. (R. at 180-88.) The Appeals Council granted Coffey's request for review, vacated the ALJ's decision and remanded the case back to the ALJ for further consideration of Coffey's nonexertional mental impairments and her capacity to perform her past relevant work. (R. 195-97, 300-03.) Upon remand, a supplemental hearing was held on November 26, 2013, at which Coffey was represented by counsel. (R. at 73-104.)

By decision dated December 20, 2013, the ALJ denied Coffey's claims. (R. at 22-39.) The ALJ found that Coffey was the unmarried widow of the deceased insured worker and had attained the age of 50; thus she met the nondisability requirements for disabled widow's benefits. (R. at 25.) To qualify for DWIB, however, the ALJ found that Coffee had to show that she became disabled prior to April 30, 2011. (R. at 25.) The ALJ found that Coffey met the nondisability

insured status requirements of the Act for DIB purposes through September 30, 2011.[1] (R. at 25.) He found that Coffey had not engaged in substantial gainful activity since May 31, 2010, the alleged onset date. (R. at 25.) The ALJ found that the medical evidence established that Coffey had severe impairments, namely sprains/strains, degenerative disc disease, anxiety and depression, but he found that Coffey did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25-26.) The ALJ found that Coffey had the residual functional capacity to perform simple, one- to two-step, light work[2] that was not quota-based, fast-paced or production-oriented; that did not require more than frequent climbing of ladders, ropes or scaffolds or stooping; and that did not require more than occasional interaction with the general public. (R. at 28.) The ALJ found that Coffey was unable to perform any of her past work. (R. at 38.) Based on Coffey's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Coffey could perform, including jobs as a cleaner, a packer and a nonpostal mail clerk. (R. at 38-39.) Thus, the ALJ concluded that Coffey was not under a disability as defined by the Act and was not eligible for DIB, DWIB or SSI benefits. (R. at 39.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2015).

---

[1] Therefore, Coffey must show that she became disabled between May 31, 2010, the alleged onset date, and September 30, 2011, the date last insured, in order to be entitled to DIB benefits.

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2015).

Case 2:15-cv-00012-PMS   Document 22   Filed 09/27/16   Page 3 of 18   Pageid#: 892

After the ALJ issued his decision, Coffey pursued her administrative appeals, (R. at 7-10), but the Appeals Council denied her request for review. (R. at 1-6.) Coffey then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Coffey's motion for summary judgment filed December 3, 2015, and the Commissioner's motion for summary judgment filed March 7, 2016.

## II. Facts

Coffey was born in 1959, (R. at 54, 79, 359, 363), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). She has a high school education and an Associate's Degree in Criminal Justice. (R. at 54, 79, 443.) Coffey has past work experience as a personal trainer, a cashier, a day manager for a retail store, a security guard and a secretary for a security company. (R. at 38, 79, 97-99, 405, 443.) Coffey testified at her hearing that the primary reason she considered herself disabled was because of the pain and the limitations associated with her back and neck. (R. at 63.)

Gerald Wells, a vocational expert, also was present and testified at Coffey's December 6, 2011, hearing. (R. at 64-71.) Wells classified Coffey's past work as a personal care attendant[3] as medium[4] and semi-skilled; as a cashier as light and

---

[3] The vocational expert questioned whether Coffey worked as a personal care attendant long enough for it to be considered semiskilled work. (R. at 65.)

unskilled; as a day manager as light and semi-skilled; as a personal trainer[5] as medium and skilled, but, as performed, at the light level; and as a security officer as light and semi-skilled. (R. at 65-69.) Wells testified that a hypothetical individual of Coffey's age, education and work history, who could perform light work and who had no more than moderate[6] limitations in the ability to deal with changes, could perform Coffey's past work as a gym attendant, a cashier and a security guard. (R. at 69-70.) Wells next testified that a hypothetical individual, who would need to take breaks at unscheduled times for unpredicted periods throughout the day and who would have difficulties in maintaining attention, concentration, persistence and pace, could not perform Coffey's past work or any other work. (R. at 71.)

Medical expert, Robert Muller, Ph.D., testified at Coffey's November 26, 2013, hearing. (R. at 88-96.) He stated that he had reviewed the medical record which indicated that Coffey was being treated for situational depression, but which did not meet or equal a listed impairment. (R. at 89-91.) Muller stated that Coffey was mildly restricted in her activities of daily living, had moderate difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation. (R. at 91.) He stated that Coffey would be capable of performing unskilled work in

---

[4]  Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2015).

[5]  The vocational expert questioned whether this job was vocationally relevant since Coffey worked at this job for only four months, which would not be time enough to learn the job adequately. (R. at 66.) Coffey worked at Curves; thus, the vocational expert stated that the job description was consistent with an attendant rather than a trainer. (R. at 67-68.)

[6]  Moderate was defined as "limited, but satisfactory" ability. (R. at 70.)

a low-stress environment.[7] (R. at 92.) Muller also stated that Coffey would be limited to no more than occasional contact with the public. (R. at 92.) He stated that the limitations identified would have been ongoing since May 31, 2010, the alleged onset date. (R. at 93.) Muller stated that there was no evidence in the record to indicate that Coffey suffered from fatigue to the point that it would diminish her ability to concentrate. (R. at 96.)

Vocational expert, Robert Jackson, also testified at Coffey's 2013 hearing. (R. at 96-101.) Jackson testified that a hypothetical individual of Coffey's age, education and work history, who could perform simple, one- to two-step light work that did not require more than frequent climbing of ladders, ropes and scaffolds and stooping; that was not quota-based, fast-based or production-oriented; and that required no more than occasional contact with the public, could not perform any of Coffey's past work. (R. at 99-100.) Jackson stated that there would be a significant number of other jobs that such an individual could perform, including jobs as a cleaner, a packer and a mail clerk. (R. at 100.) Jackson next testified that a hypothetical individual, who would need to take breaks at unscheduled times for unpredicted periods throughout the day and who would have difficulties in maintaining attention, concentration, persistence and pace, could not perform Coffey's past work or any other work. (R. at 100-01.)

In rendering his decision, the ALJ reviewed records from Buckingham County Sheriff's Office; Buckingham Department of Social Services; Alan D. Entin, Ph.D., a state agency psychologist; Dr. David C. Williams, M.D., a state agency physician; John Kalil, Ph.D., a state agency psychologist; Dr. Paul Frye,

---

[7] Muller stated that a lower-stress environment did not include jobs that would be quota-based or production-oriented. (R. at 92.)

M.D., a state agency physician; Hildebran Medical Clinic; Arvonia Chiropractic Center; Health and Wellness Center of Louisa; Dr. Anjali Joshi, M.D.; Martha Jefferson Buckingham Family Medicine; Central Virginia Community Health Center; and University of Virginia Health Systems.

On June 5, 2009, Coffey was seen at Hildebran Medical Clinic for complaints of hot flashes and situational anxiety related to the loss of her job and her husband also losing his job. (R. at 559.) Her mood and affect were normal. (R. at 559.) She was diagnosed with hot flashes; menstrual disorder; situational anxiety; tobacco abuse; and coronary artery disease. (R. at 559.) In July 2009, Coffey was diagnosed with left anterior chest wall pain of unclear etiology. (R. at 557-58.) X-rays of Coffey's left ribs taken on July 20, 2009, were normal. (R. at 563.) On September 30, 2009, Coffey reported situational anxiety resulting from home foreclosure and marital problems. (R. at 556.) Her mood and affect were reported as normal. (R. at 556.) Coffey was diagnosed with situational anxiety, generalized anxiety disorder and dental pain, pending extraction. (R. at 556.)

On December 17, 2009, Coffey was seen at Health & Wellness Center of Louisa. (R. at 578-82.) Examination revealed tender cervical paraspinous muscles; full range of motion of the head; and good and equal strength in her arms and legs with pain in her hands. (R. at 582.) She was diagnosed with back pain. (R. at 581.)

The record shows that Coffey underwent chiropractic treatment at Arvonia Chiropractic Center from June 1, 2010, through June 7, 2010, for work-related injuries to her back and right leg. (R. at 565-75.) Coffey had trigger points in her cervical flexors and extensors, trapezius, rhomboids, thoracic muscles, lumbar extensors, gluteus muscles and hamstrings, for which she received an adjustment.

7

(R. at 572.) It was noted that Coffey's left leg was shorter than her right. (R. at 571, 573.) On June 7, 2010, Coffey reported some relief from her last adjustment. (R. at 574.) Coffey had decreased lumbosacral spine flexion with musculoskeletal point tenderness from L4 to her sacrum; her pain was at a six on a scale of one to 10; and she received another adjustment. (R. at 574.)

On June 17, 2010, Coffey was seen at Central Virginia Community Health Center for complaints of anxiety. (R. at 585-86.) She reported that she had been prescribed Xanax in the past, stating that, it "made me feel really good, makes my depression go away." (R. at 585.) Physical examination showed that Coffey had a normal gait and reflexes; no weakness in her upper and lower extremities; she was mildly depressed; and she had normal memory, judgment and insight. (R. at 586.)

On October 21, 2010, Dr. David C. Williams, M.D., a state agency physician, found that Coffey had the residual functional capacity to perform light work that did not require more than frequent climbing of ladders, ropes or scaffolds and stooping. (R. at 113-14.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 114.)

On October 22, 2010, Alan D. Entin, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Coffey was mildly restricted in her activities of daily living and in maintaining social functioning; had no limitations in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 111-12.) Entin also completed a mental assessment, finding that Coffey was moderately limited in her ability to interact appropriately with the general public and to respond appropriately to changes in the work setting. (R. at 114-15.)

8

Coffey was treated at the University of Virginia Health Systems, ("UVA"), from December 2010 through August 2013 for back and neck pain; depression; visual phenomenon; presbyopia; costochondritis; and ear pain. (R. at 598-794.) On December 8, 2010, Coffey complained of chest pain and depression. (R. at 604-07.) She stated that she became depressed after the death of her two husbands and several family members. (R. at 605.) Coffey admitted that she was in a physically and verbally abusive relationship. (R. at 605.) Physical examination revealed that Coffey had normal range of motion; normal heart rate, regular rhythm and intact distal pulses; normal breath sounds with no wheezes or rales; normal reflexes; no cranial nerve deficit; and normal muscle tone and coordination. (R. at 606-07.) Dr. David Bains, M.D., noted that Coffey was tearful throughout the interview. (R. at 607.) Dr. Bains noted that the majority of Coffey's depressive symptoms were related to the abuse she was experiencing. (R. at 607.) He noted that Coffey's back pain was likely secondary to known degenerative joint disease. (R. at 607.)

On January 13, 2011, Coffey complained of back pain. (R. at 601-03.) She stated that her depression had improved since her home situation had been resolved. (R. at 603.) A stress test was performed, yielding normal results. (R. at 602, 618-22.) Physical examination revealed that Coffey had normal range of motion; normal rate, regular rhythm and intact distal pulses; normal breath sounds with no wheezes or rales; normal reflexes; no cranial nerve deficit; and normal muscle tone and coordination. (R. at 603.) Dr. Bains noted that Coffey's back pain was likely secondary to degenerative disc disease. (R. at 603.) On March 25, 2011, Dr. Bains's examination of Coffey revealed normal range of motion; normal heart rate, regular rhythm and intact distal pulses; normal breath sounds with no wheezes or rales; normal reflexes; no cranial nerve deficit; and normal muscle tone and

9

coordination. (R. at 600.) He noted that Coffey's mood was much improved. (R. at 600.)

Dr. Bains's physical examination findings remained the same during Coffey's April and June 2011 visits. (R. at 660-66.) On June 20, 2011, an MRI of Coffey's cervical spine showed mild reversal of the normal cervical lordosis with multi-level degenerative disc and facet disease, most prominent at the C5-C6 disc space with severe spinal canal stenosis causing flattening and kinking of the spinal cord, but no abnormal cord signal, and multi-level foraminal stenosis, most prominent at the C5-C6 disc space with severe right and moderate left foraminal stenosis. (R. at 628-29.) Also on that day, an MRI of Coffey's thoracic spine showed multi-level mild degenerative disc disease without significant spinal canal or foraminal stenosis. (R. at 628-29.) An MRI of Coffey's lumbar spine performed the same day showed multilevel degenerative disc and facet disease most prominent at the L4-L5 level with mild spinal canal stenosis; multi-level foraminal stenosis, most prominent at the L5-S1 level, with moderate left foraminal stenosis; and probable right renal cyst. (R. at 628-29.) On August 12, 2011, an x-ray of Coffey's cervical spine showed advanced degenerative disc disease and mild retrolisthesis at the C5-C6 disc space with increased retrolisthesis upon extension. (R. at 672.) Also on that day, x-rays of Coffey's lumbar spine showed degenerative disc disease at the L5-S1 level and, to a lesser degree, at the L4-L5 level. (R. at 674.) A carotid duplex was performed on September 21, 2011, which showed mild heterogeneous atheroma bilaterally; minimal to mild stenosis in the right and left internal carotid artery; and right and left vertebral artery was patent with antegrade flow. (R. at 687-88.)

In July 2011, the assessment of Dr. Yuri Maricich, M.D., was depression and chronic abusive relationship. (R. at 660.) It was reiterated to Coffey that she should consider leaving her abusive situation and take advantage of the multiple resources discussed with Dr. Bains, but she stated that she was not interested in doing so. (R. at 660.) On August 9, 2011, Dr. P. Joshua Smith, M.D, a physician with UVA, saw Coffey for complaints of back, neck and leg pain. (R. at 649-56.) Coffey had decreased range of motion of her neck with tracheal and muscular tenderness. (R. at 655.) Coffey's neurological examination revealed normal strength; no atrophy; no trauma; no cranial nerve deficit or sensory deficit; and normal muscle tone and coordination. (R. at 655.) Dr. Smith reported that Coffey's behavior, mood and affect were normal. (R. at 655.) A nerve conduction study was performed on August 19, 2011, and showed no evidence of a left or right cervical radiculopathy or carpal tunnel syndrome. (R. at 643.) On August 22, 2011, Dr. Ryan Scruggs, M.D., saw Coffey for complaints of seeing white dots and wavy lines, lightheadedness and fainting. (R. at 635-38.) Dr. Scruggs noted that Coffey's symptoms were concerning for posterior circulation problems. (R. at 638.) Coffey's ophthalmic examination was normal. (R. at 638.) He diagnosed visual phenomenon and presbyopia. (R. at 638.)

On January 31, 2012, Coffey's physical examination was normal with the exception of decreased sensation in all extremities, thenar[8] wasting bilaterally and positive straight leg raising tests. (R. at 771-72.) It was noted that Coffey could benefit from surgery, but she refused due to risk of paralysis. (R. at 771.) On February 21, 2012, Coffey complained of chronic ear pain with hearing loss. (R. at 754-59.) Physical examination was normal. (R. at 756.) It was noted that her

---

[8] Thenar is defined as the fleshy mass on the palm at the base of the thumb. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 828 (1995).

behavior, mood and affect were normal, and her judgment and thought content were normal. (R. at 756.) She was diagnosed with ear pain and chronic pain. (R. at 756.) On April 9, 2012, Coffey complained of ear pain and tinnitus. (R. at 751-54.) An audiogram was performed and showed mild, symmetric sensorineural hearing loss with associated tinnitus. (R. at 752-53.) On April 17, 2012, Dr. Anjali Joshi, M.D., noted that injections had been offered to Coffey for pain management, but she refused them. (R. at 747-50.) Coffey reported that she took Tylenol for her back pain. (R. at 748.) Dr. Bradley W. Kesser, M.D., noted that the most likely etiology for Coffey's otalgia was temporomandibular joint, ("TMJ"), dysfunction. (R. at 751.) She complained of chronic daily headaches. (R. at 748.) Physical examination was normal. (R. at 750.) Coffey's mood was depressed. (R. at 750.) Dr. Joshi noted that Coffey's depression and anxiety were related to her ongoing psychosocial stressors and home situation, including physical and emotional abuse from her boyfriend. (R. at 750.) It was noted that Coffey's chronic pain was exacerbated by emotional stress. (R. at 750.) Coffey refused an offer of support and to speak to a social worker. (R. at 750.)

On June 20, 2012, Coffey's physical examination was normal. (R. at 746.) Her mood and affect were normal. (R. at 746.) Dr. Joshi noted that Coffey was occasionally tearful, but her mood overall had much improved. (R. at 746.) On August 13, 2012, Dr. Joshi completed a medical assessment, indicating that Coffey could lift and carry items weighing less than 10 pounds. (R. at 708-12.) Dr. Joshi found that Coffey could stand and/or walk less than two hours in an eight-hour workday. (R. at 708.) Dr. Joshi found that Coffey could sit less than six hours in an eight-hour workday. (R. at 709.) Dr. Joshi reported that Coffey's ability to push and/or pull was affected due to decreased range of motion in both her neck and lower back. (R. at 709.) Dr. Joshi opined that Coffey could never climb, balance,

kneel, crouch, crawl or stoop. (R. at 709.) Dr. Joshi found that Coffey was limited in her ability to reach in all directions and to handle. (R. at 710.) It was noted that she could occasionally reach, handle and finger and never feel. (R. at 710.) No visual or environmental limitations were noted. (R. at 710-11.) Dr. Joshi opined that Coffey had the residual functional capacity to perform less than sedentary work. (R. at 711.)

In April 2013, Coffey reported that the lumbar epidural steroid injections administered in August 2012 did not help. (R. at 729-31.) Her physical examination was normal. (R. at 731.) On July 3, 2013, Coffey complained of right shoulder pain. (R. at 726-29.) She had normal strength with right shoulder flexion, extension, abduction and adduction. (R. at 728.) Coffey had point tenderness at the manubrial clavicular junction, but no joint swelling or surrounding erythema. (R. at 728.) Dr. Michael Brian McCabe, M.D., diagnosed costochondritis. (R. at 728.) On August 12, 2013, Coffey reported that she continued to have trouble in her home. (R. at 724.) Dr. Joshi noted that Coffey's physical examination was normal, including normal range of motion throughout all extremities; normal gait; and normal mood and affect. (R. at 725-26.) Dr. Joshi reported that a large source of Coffey's chronic back pain could be related to anxiety and the first step would be to remove the primary stressor. (R. at 726.)

On May 9, 2011, John Kalil, Ph.D., a state agency psychologist, completed a PRTF, indicating that Coffey was mildly restricted in her activities of daily living; had moderate difficulties in maintaining social functioning; had no limitations in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 146-47.) Kalil also completed a mental assessment, finding that Coffey was moderately limited in

13

her ability to interact appropriately with the general public and to respond appropriately to changes in the work setting. (R. at 149-50.)

On May 9, 2011, Dr. Paul Frye, M.D., a state agency physician, found that Coffey had the residual functional capacity to perform light work that did not require more than frequent climbing of ladders, ropes or scaffolds and stooping. (R. at 147-49.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 148-49.)

On January 11, 2013, Coffey was seen by Dr. Theresa A. Rupp, M.D., to establish care. (R. at 717-18.) Dr. Rupp noted that Coffey appeared older than her stated age. (R. at 717.) Physical examination was normal. (R. at 717-18.) Coffey's station and gait were intact, and she did not use mobility aids. (R. at 718.) It was noted that cervical spine surgery had been recommended to Coffey, but she was hesitant to proceed. (R. at 718.) Dr. Rupp diagnosed coronary artery disease with history of myocardial infarction; cervical degenerative disc disease; and domestic violence victim. (R. at 718.) Lab work showed that Coffey's cholesterol was extremely elevated, and she was prescribed cholesterol medication. (R. at 723.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB, DWIB and SSI claims. *See* 20 C.F.R. §§ 404.335(c), 404.1520, 416.920 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can

return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Coffey argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Coffey also argues that the ALJ failed to pose hypothetical questions to the vocational expert that contained specific findings related to her nonexertional limitations; thus, erring in finding that a substantial number of jobs existed in the national economy that she could perform. (Plaintiff's Brief at 5-6.)

The ALJ found that Coffey had the residual functional capacity to perform simple, one- to two-step, light work that was not quota-based, fast-paced or production-oriented; that did not require more than frequent climbing of ladders, ropes or scaffolds or stooping; and that did not require more than occasional interaction with the general public. (R. at 28.)

Coffey argues that the ALJ, in arriving at her physical residual functional capacity finding, should have given more weight to the opinions of her treating and examining physician, Dr. Joshi. (Plaintiff's Brief at 5-6.) The ALJ must generally

give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c), 416.927(c) (2015). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Here, the ALJ stated that he was giving Dr. Joshi's opinion little weight, as it appeared that he relied on Coffey's allegations in forming his opinion and did not adequately consider her few physical signs on examination and her limited and conservative treatment. (R. at 37.) The ALJ, instead, gave great weight to the opinions of the state agency physicians who found that Coffey had the residual functional capacity to perform light work. (R. at 37, 113-14, 147-49.) The ALJ found that their opinions were consistent with Coffey's mixed findings on examination with limited and conservative treatment. (R. at 37.) While I agree that the opinions of the state agency physicians are more consistent with Coffey's rather benign findings on physical examinations and conservative treatments, these opinions were formed without a full review of the medical records. In particular, neither state agency physician had the benefit of reviewing Coffey's June 20, 2011, MRI of her cervical spine showing severe spinal canal stenosis at the C5-C6 level. Also, neither was aware of the finding of thenar wasting in her hands bilaterally in January 31, 2012, which could be caused by cervical spine nerve root impingement. Therefore, while the ALJ might have been justified in disregarding Dr. Joshi's opinions, the opinions of the state agency physicians, who did not have

the benefit of the entirety of the medical evidence, do not constitute substantial evidence to support the ALJ's finding as to Coffey's residual functional capacity. Therefore, I will vacate the Commissioner's decision denying benefits and remand for further development consistent with this Opinion. An appropriate Order and Judgment will be entered.

DATED:     September 27, 2016.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE